(81 App. Div. 314.)

REILLY et al. v. HOME INS. CO.

(Supreme Court, Appellate Division, Third Department. March 11, 1903.)

1. MARINE INSURANCE—EXCEPTED RISKS—BURDEN OF PROOF.
　　By the terms of a policy on a barge, risks arising from want of care in loading and from unseaworthiness and defects were excepted. The barge, with her cargo, sank while lying at a dock on a calm night; and it appeared that one of her sides had parted from both the deck and the bottom, and that various parts of the structure were broken and displaced. *Held*, in an action on the policy, that the burden of proof was on plaintiff to show by a fair preponderance of evidence that the disaster arose from perils insured against, and not from anything among the excepted risks.

2. SAME—EVIDENCE—TENDENCY.
　　In an action on a policy on a barge, which policy had excepted inherent defects and unseaworthiness, evidence considered, and *held* that the preponderance of it showed that the loss was due to the barge having been structurally too weak to sustain its cargo.

Appeal from Trial Term.

Action by Edward Reilly and another against the Home Insurance Company. From a judgment for plaintiffs, and from an order denying a motion to set aside the verdict and for a new trial, defendant appeals. Reversed.

Argued before PARKER, P. J., and SMITH, CHASE, and LYON, JJ.

William Ives Washburn, for appellant.

John F. Foley, for respondents.

LYON, J. This action was brought to recover for the loss of a barge which was insured under a policy of short-term insurance issued by the defendant, insuring the boat against the adventures and perils of the harbor of New York, the Hudson river, and other waters named in the policy. By the terms of the policy there were excepted all claims arising from or caused by want of ordinary care and skill

¶ 1. See Insurance, vol. 28, Cent. Dig. § 1659.

in loading and stowing the cargo of the vessel, from rottenness, inherent defects, and other unseaworthiness. The vessel sank, with her cargo, at West Fifty-Fifth street, New York City, at midnight, August 17, 1900. The amount of the loss was conceded upon the trial, and the two questions litigated were (1) whether the loss arose from inherent defects or through unseaworthiness; (2) whether the loss arose by reason of the adventures and perils of the waters specified in said policy of insurance.

The plaintiff contended upon the trial that the cause of the disaster was the bottom of the barge springing a leak on the shore side, as the result of the barge having rested at low tide upon the bottom of the slip, while the defendant contended that the loss arose solely by reason of inherent defects in her construction—particularly that of weakness of the deck, in that the deck beams rested only from 3½ to 4 inches upon the top log—and that the knees were of insufficient strength, and the deck and bulkheads insufficiently braced to properly strengthen the boat against lateral pressure.

The barge was square-built, and carried her load upon deck. She was built in 1899, about 13 months prior to the disaster. She was 110 feet long and 33 feet wide on deck, and about 90 feet long and 32 feet wide on the bottom. Her deck beams projected but from 3½ to 4 inches upon the top log, although one of the plaintiffs testified that he thought they should have projected 6 inches. Each beam was supported by a knee running to the side of the boat, and by three bulkheads running the length of the boat. The bulkheads were made of plank 4 inches thick and 12 inches wide, placed with the edges together, and bolted through from top to bottom, and were stiffened and stayed against buckling by stanchions bolted through the bulkhead, and extending from the cross-kelsons to the deck beams. There were no knees or braces running to the bulkheads. She had no cross-braces, and below deck was all clear fore and aft, excepting for the bulkheads, knees, and cabin.

After the barge had been in use for some months, material alterations were made in her. A portion of the deck planks were cut out to make an opening for the hatchway, which was put in the middle of the deck; a portion of the upper plank (4 by 12) of the middle bulkhead was at some time prior to the disaster taken out to make more room in the cabin; and she was fitted with a boiler, water tank, engine, derrick, mast, and boom, and was thus built with a steam-hoisting power, with which to load and unload her cargoes. The mast, which was 26 inches in thickness and about 90 feet in height, was placed in the middle line of the boat, about 22 feet from the stern; a strip 4 inches in width being slit upwards from the bottom of the mast, allowing it to slip over the center bulkhead and rest in the step in the bottom of the boat. One of the plaintiffs says that, at the time these alterations were made, nothing was put in the boat in the way of strengthening her. The boom, 80 feet in length, was attached to the mast 16 or 18 feet from the deck, and during the two or three days prior to the disaster had been used in hoisting and swinging stones from the dock to the deck of the boat. These stones generally averaged in weight from 500 to 3,000 pounds, but

a few weighed, perhaps, 4,000 pounds; and the stones were loaded, as a compact mass, upon the deck of the boat. Raising the stones from the dock by use of the boom caused the barge to list towards the dock, and depositing the stones upon the deck of the boat outside the center line, caused the barge to list outshore. Both operations placed more or less lateral strain upon the barge. At about half past 5 o'clock in the afternoon the work of loading the barge was completed, and one of the plaintiffs testifies that she then had upon her deck in the neighborhood of 700 tons or more, and that he thought she could carry 800 tons. The master of the barge, who, so far as the evidence discloses, was the only eyewitness of the disaster, says that after completing the loading, at about half past 5 in the afternoon, he went through the boat, examined her, and found her perfectly dry and tight; that just before midnight he was awakened by the sound of wood breaking, or something like that; that he immediately went through the barge with a light, going up one side of the boat, and back down the other, to see if he could see any cracks, examined her thoroughly, and tried her pumps, and that there was no water in her; that she was dry; that he then returned to the engine room, and in 5 or 10 minutes heard a great noise, whereupon he ran to the deck when the boat listed towards the shore, and he jumped upon the dock, and the deck broke away from the offshore side, and the barge immediately sank. An examination of the boat after the accident disclosed that the offshore side had parted from both the deck and bottom about 3 feet amidships, running to a point at both the bow and stern; that the deck beams had pulled away from the bolts fastening them to the top log; none of the deck beams being broken, save as the wood from the bolts to the end of the beams was pulled out, leaving the bolts in the top log. Several of the knees upon the port side were either pulled out or broken off. The center and port bulkheads were tipped to the port side, and the starboard bulkhead was tipped to the starboard side, and a considerable portion of the stone near the cabin had slid down into the hold, and some of it over the side of the boat towards the dock. No examination of the inshore side or portion of the bottom could be made after the disaster, and there is no direct evidence that the 6-inch planking constituting her sides or bottom had suffered any strain or injury whatever.

As before stated, the plaintiff's theory of the cause of the disaster was that the boat sprang a leak as the result of a strain caused by the barge resting upon the bottom of the slip at low tide. The master of the barge testified that he could not say whether the boat touched the bottom at low tide or not, but that after being loaded it drew from 8½ to 9 feet of water. The submarine diver employed by plaintiffs testified that the depth of water next the dock was about 8 feet, and that it gradually deepened to 16 feet at the outside of the boat.

Conceding these to be the facts, the pitch of the boat sidewise was gradual, and was but from 6 to 12 inches in its whole bottom width of 32 feet; and upon no reasonable hypothesis can it be claimed that this position, with the load of stone equally distributed over the deck

of the boat, so strained the boat as to cause a leak which did not develop until six hours afterwards, and then almost instantly destroyed the barge. At the time the boat sank there was nearly high tide, and, concededly, she had been free from the bottom for some five hours; and no leak whatever had developed up to the time of the cracking sound, five or ten minutes before she went down.

One of the plaintiffs testified that he never knew a boat to go to pieces from a leak, and the master testified that he could not tell how the disaster occurred. It was concededly a calm night, and the water was smooth, excepting the swell from the passing tugs, which was not sufficient to rock the barge when the master tried her pumps, just before the disaster.

The burden of proof was upon the plaintiffs to show by a fair preponderance of evidence that the disaster arose from some of the perils insured against, and that it did not occur by reason of any inherent defects and other unseaworthiness, as among the excepted risks. Berwind et al. v. Greenwich Ins. Co., 114 N. Y. 231, 21 N. E. 151.

The overwhelming preponderance of evidence was to the effect that the barge was structurally too weak to sustain such a load, and that its collapse was a result thereof; and we think that the verdict of the jury was contrary to the evidence, and that a new trial should be granted.

The judgment and the order denying the motion made at the trial, upon the minutes, to set aside the verdict and for a new trial, should be reversed, and a new trial granted, with costs to abide the event. All concur.