### 16426, 16427. LIPSHITZ *v.* NEW ZEALAND INSURANCE COMPANY; and *vice versa.*

1. Where an insurance company issued to the insured a certificate covering the insurance agreement, in which certificate there was a statement to the effect that the insurance company had insured a certain cargo of the insured "under policy No. 7," that policy was enforceable as a part of the contract when properly identified.

2. It was not improper for the court to permit the agent of the defendant company to testify, over objection of the plaintiff, to the identity of "policy No. 7," produced in response to the plaintiff's notice to produce, and to testify that the policy so produced was the only "policy No. 7" in the United States; and, in view of the proper admission of that testimony, this court can not say that the improper and irregular admission of the verified response to the notice to produce, in which practically the same statements as above were made, or that

the refusal of the court to strike certain portions of that response constituted harmful or reversible error.

3. Where the original certificate of insurance insures the merchandise while on a named vessel or other steamer from one named port to another, via port or ports including transshipment if incurred, and where a clause in the insurance policy, referred to in the certificate, restricts the liability of the insurer to damages done to the cargo by "perils of the sea," resulting from "actual contact of sea water with the articles damaged," and evidence is wholly lacking as to how the damage was occasioned, except that it appears, from undisputed evidence, that the cargo was wet and damaged by fresh water, there is no error in directing a verdict for the defendant.

4. Assuming that by the terms of the certificate of insurance the protection embraced "perils of the sea" encountered while at ports of transshipment, the evidence nevertheless fails to indicate that the damage, wherever done, was occasioned by "perils of the sea;" furthermore, even assuming that sea water could, under the contract, be held to mean any water in which the vessel floated, the evidence wholly fails to show that the water occasioning the damage was of that character.

DECIDED FEBRUARY 13; 1926.

Complaint; from Fulton superior court—Judge Bell. December 11, 1924.

Application for certiorari was made to the Supreme Court.

B. S. Lipshitz sued The New Zealand Insurance Company Limited upon an insurance contract, because of damage to a cargo of rags shipped by the plaintiff from Riga in Latvia to the port of Philadelphia. The plaintiff incorporated in his petition a copy of the insurance certificate, designated as "Ocean Cargo Certificate," which provided in part as follows: "This is to certify that on the 21st day of November, 1921, we, the undersigned, insured under policy No. 7, for B. S. Lipshitz, the sum of four thousand dollars on bales of carbonized woolen rags, valued at sum insured on board S. S. 'Hebron' and/or other steamer or steamers and connections at and from Riga, Latvia, to Philadelphia via port or ports including transshipment if incurred. Loss, if any, payable upon surrender of this certificate, to the order of assured or order." Another provision of the certificate was the following: "It is understood and agreed that this certificate represents and takes the place of the policy, and conveys all the rights of the original policyholder (for the purpose of collecting any loss or claim), as fully as if the property were covered by a special policy direct to the holder of this certificate, and free from any liability for unpaid premiums." The plaintiff filed an amend-

ment setting up that the said cargo consisted of eight hundred bales of woolen rags; that the damage was suffered between the time of its delivery to steamship Hebron, at Riga, about November 15, 1921, and the date of its delivery in Philadelphia, about December 27, 1921; that "said cargo was damaged by wetting with water, which wetting caused the cargo to depreciate in value, by causing the rags to have an irremovable bad smell, rendering it less suitable," etc.; that "said cargo certificate is a contract of marine insurance between petitioner and defendant, insuring petitioner against perils of the sea, and was so intended and understood by petitioner and defendant." By amendment, the percentage of the damage was alleged, and it was alleged that carbonized woolen rags were of greater market value than rags not carbonized; that the plaintiff claimed the right to have this error corrected in the description under the terms of said certificate, and that the failure to pay the loss was malicious and wilful, so as to permit plaintiff to recover attorney's fees, etc. Another amendment, admitting a credit to the defendant of the amount of the premium, was filed. Demurrers to the petition and to the amendments were overruled. The defendant filed exceptions pendente lite to the overruling of the demurrers, and by a cross-bill of exceptions assigns error thereon. In its answer to the suit the defendant denied all liability to the plaintiff, and set up that policy No. 7, referred to in the certificate, was a part of the insurance contract, and that under the terms of the insurance contract the loss sustained was not occasioned by perils of the sea, and that the character of the loss was a specific exception from liability. At the trial the court, on the conclusion of the testimony, directed a verdict for the defendant, saying: "In the opinion of the court, construing both of these papers, the certificate sued on, together with the policy introduced and the application for the policy, the plaintiff has failed to make out his case. . . The damage claimed in the plaintiff's suit is not covered by the contract, the evidence showing that the damage was not done by contact with sea water occasioned by sea perils." The plaintiff filed a bill of exceptions alleging that the court erred in directing the verdict.

*Henry A. Alexander,* for plaintiff.

*Smith, Hammond & Smith,* for defendant.

JENKINS, P. J. (After stating the foregoing facts.) The

brief for the plaintiff in error says: "The bill of exceptions complains of the following four rulings: (1) That so-called 'policy No. 7' was a part of the contract. (2) In refusing to reject the evidence of Jones in reference to 'policy No. 7,' set out on page 2 of the bill of exceptions. (3) The refusal of the court to reject three paragraphs of the response to the notice to produce, set out on page 4 of the bill of exceptions. The so-called 'policy No. 7' was included in this motion to reject which was overruled. (4) The order of the court directing a verdict in favor of the defendant." This statement of counsel condenses the issues before this court so that the case will be disposed of by a consideration of the propositions thus set forth. It is urged by the plaintiff that "policy No. 7" did not constitute a part of the insurance contract; that the certificate set forth in the statement of facts was a complete contract of insurance, which protected the plaintiff from "perils of the sea" to his shipment of rags. Was "policy No. 7" a part of the insurance contract? It is directly referred to and in terms adopted as a part of the contract, by the certificate upon which plaintiff's action is founded. The only obligation assumed is that "We, the undersigned, insured under policy No. 7 for B. S. Lipshitz," etc. In the case of *Queens Ins. Co.* v. *Hartwell Ice &c. Co.,* 7 *Ga. App.* 787 (68 S. E. 310), a binder was issued to the insured, but not actually delivered to him, but inserted at a certain page of the book containing the forms of the regular policies of the companies involved, accustomed to be used by the agent when insuring for that company. The court held: "The property described in the memorandum or 'binder' was insured during the term specified therein upon the terms and conditions of the regular standard policy of the company, and a breach of any of these terms and conditions that would render void the regular policy would also make void the temporary contract, and any waiver of such breaches would apply to the latter." It will thus be seen that this court has held in a case of fire insurance that "the terms and conditions of the regular standard policy of the company" are written into the "binder" even though there be no express reference to or adoption of such standard policy. In the case of *Underwriters' Agency* v. *Sutherlin,* 46 *Ga.* 652, Sutherlin sued the company by attachment, basing his right of

recovery upon a certificate reciting that "This is to certify that William T. Sutherlin is insured for account of whom it may concern, under and subject to the conditions of policy No. 780, issued by the above-named companies, in the sum of $4000," etc. The defendant company offered in evidence the policy referred to in the said certificate, which was excluded on the plaintiff's motion. Verdict and judgment were for the plaintiff. In reversing the judgment of the court below the Supreme Court said: "We think the court erred in ruling out the policy, or, rather, we are of opinion that the policy was a necessary part of the plaintiff's case. The certificate is not, of itself, a complete contract by the company. It expressly provides that the terms and conditions of the contract are to be regulated by policy No.——. On its very face the paper produced shows that it does not contain the whole contract. How can any one say what the contract was from the certificate alone? What is the risk taken? It does not say. What are the terms and conditions? It does not say. It stipulates, expressly, that the terms and conditions are set forth in another paper. True, that other paper is in the custody of the defendant; but that was well known to the parties. It was the usual mode of business for the agent to retain this paper. But its contents were well known to Rust, who was the mutual agent of both parties, as the evidence shows. In any event, the paper certificate declares and notifies all concerned that it is not the whole contract. It was in the power of the plaintiff to compel the production of the policy, and as it was a necessary part of the plaintiff's case, she should have taken the legal steps required for that purpose. As it was produced by the defendant, without notice, the plaintiff's case, in this respect, was complete. But when, on his motion, it was ruled out, his case was fatally defective, since it appeared, affirmatively, to the court that the full contract of the parties was not before the jury." The headnote in that case is as follows:: "Where an insurance was effected under an open policy of insurance, issued to the company's agent, the insured taking a certificate that his insurance was according to the terms specified in said open policy, which was retained by the agent: *Held,* that in a suit for a loss, it was not sufficient for the plaintiff to produce the certificate alone, since on its face it appeared that it did not contain the whole agreement."

Moreover, it appears from information derived from standard text-writers upon the subject of marine insurance that there has grown up within latter years a well-known practice among such companies to issue what are known as "certificates," quasi-negotiable instruments, covering cargo insurance under open or other policies referred to therein. The course of business in this respect is described by Winter in his book on Marine Insurance, as follows: (p. 106) "Insurance certificates are issued for the purpose of transferring insurance and are quasi negotiable. The insurance being transferred by endorsement, the holder of the certificate receives all the rights of the original assured, but also assumes all liabilities that may be attached to the insurance, as for example liability for unpaid premiums. Even this liability is waived in many cases by underwriters who stipulate in the certificate, that with respect to a third party holder of the certificate all liability for unpaid premium is waived." This author says further (p. 121): "In the last twenty-five years the insurance certificate has largely supplanted the policy in connection with the negotiation of documents relating to cargo shipments. The use of this certificate has already been explained, but its consideration at this point is pertinent, since its purpose of primarily to transfer to the holder the benefit of the insurance which, in the event of loss, is the right to claim the indemnity which the insurance provides. As most merchants have open policies covering all shipments which are at their risk, the insurance certificate provides a simple and convenient method of evidencing the insurance and of making possible the payment of loss to a bona-fide holder of the commercial documents. These certificates, when negotiable, provide that loss shall be payable to a designated person or order, these last two words enabling the payee by simply signing his name across the back of the certificate to transfer the payment of loss."

While we think that the decision in *Underwriters' Agency* v. *Sutherlin,* supra, settles the principles involved in this matter, attention will be called to some other authorities which have passed upon this matter. The case of Imperial Shale Brick Co. v. Jewett, 169 N. Y. 143 (62 N. E. 167), seems to be in point. The certificate in that case provided as follows: "This is to certify that the Imperial Shale Brick Company [is] insured

under and subject to the conditions of open policy No. 4007, issued by the Buffalo Fire and Marine Underwriters . . in the sum of $2000, on paving brick. . . Loss, if any, payable to order of assured thereon and return of this certificate. Valid when countersigned by the authorized agent of this company at Buffalo, N. Y." In the opinion of the court in that case it was said: "The open policy No. 4007, referred to in the certificate, was then [at the time of issuance of the certificate] in the defendant's office in the city of Buffalo, 180 miles from Cleveland. It had not been seen by the plaintiff, and its contents were unknown to it. . . The course of defendant's business was never to deliver a policy to the assured, but only such a certificate referring to such an open policy in the custody of some one of their agents. Thus the certificate delivered in Cleveland could refer to an open policy in Buffalo, and a certificate delivered in Buffalo to another open policy, however distant it might be from the assured. . . With the certificate delivered and the open policy thus withheld, the plaintiff was led by the defendants to understand that he was dealing with a known corporation or company of the name and residence mentioned in the certificate, instead of with nineteen persons whose names, residences, and solvency were unknown. . . We must read the certificate and open policy together in the light of the rule, particularly applicable to insurance policies, that of two admissible constructions the one against the insurers should be preferred. . . It had notice by the reference in the certificate to look to the open policy for the terms and conditions of the insurance it bought, but not a notice substituting nineteen individual several underwriters for the company. . . The reference to the open policy is to ascertain the quality of the insurance which the company named in the certificate sold as a single underwriter, or as joint underwriters to the plaintiff, that is to say, the plaintiff's cargo is insured against the perils in the open policy expressed, and under the terms and conditions therein expressed, to be observed by the plaintiff. . . Construing the words 'under and subject to the conditions of open policy No. 4007 issued by the Buffalo Fire and Marine Underwriters' . . favorably to the plaintiff, the words do not say or means under the open policy, but under its terms and conditions." In Conner v. Manchester Assur. Co., 130 Fed. 743 (65 C. C. A. 127, 70 L. R. A. 106),

the Court of Appeals held that the assured were bound by the terms and conditions of an open policy in the underwriter's possession which they had never seen. In that case the court said: "The plaintiffs in error [the assured] . . advert to the fact that they paid for and accepted the certificate of insurance, which declared in general terms that they were insured against loss by fire, but elsewhere referred to another instrument, presumably a blank form, constituting certain limitations of the risk assumed, which policy they never saw and the terms of which they never knew. To that contention the law makes this answer: The plaintiff in error accepted an instrument which contained a reference to another instrument in which were embodied the limitations, and which were made a part of the contract. They were presumed to know the contents of the paper which they received, and if they had read it they would have observed that it referred to and adopted the provisions of the other instrument. They had the right to demand an inspection of that instrument, and, if inspection had been refused, to decline to enter into the contract."

The plaintiff in error in the instant case makes the contention that "The so-called policy No. 7 is not a policy, but at most only a blank form of policy; it is incomplete as a policy upon its face and void through lack of counter-signature which is required by its own terms; and it is too vague and uncertain to create any contractual obligations." We think that this contention is disposed of by the following statement from Imperial Shale Brick Co. *v.* Jewett, supra. "The reference to the open policy is to ascertain the quality of the insurance which the company named in the certificate sold, . . that is to say, the plaintiff's cargo is insured against the perils in the open policy expressed, and under the terms and conditions therein expressed, to be observed by the plaintiff."

2. Having held that policy No. 7 is a part of the insurance contract and must be given effect under the contract, it remains to inquire into the additional terms and conditions which were imported into the contract by the provisions of "policy No. 7." In this policy was the following provision: "Warranted by the assured free from damage or injury from dampness, change of flavor or decay, or from being spotted, discolored, musty, or moul-

dy, *unless caused by actual contact of sea water with the articles damaged* occasioned by sea perils." The trial judge, in directing the verdict for the defendant, used the language set forth in the statement of facts. We are in entire accord with this statement of the trial judge. There was no evidence going to show how the alleged injury was occasioned. One witness surmised that the damage to the goods might have been occasioned while they were at the inland port of Hamburg. There is, however, no evidence going to indicate that the cargo was injured by "perils of the sea" while in port for the purpose of transshipment or while on the high seas. There was no evidence that it was injured "by actual contact of sea water with the articles damaged." On the contrary, it is admitted by the plaintiff that the damage was occasioned by fresh water. The term "perils of the sea" and "perils of navigation" are not synonymous. In 38 Corpus Juris, 1098, § 268, "perils of the sea" are defined as follows: "Perils of the sea embrace all kinds of marine casualties, such as shipwreck, foundering, stranding, collision, and every specie of damage done to ship or goods at sea by the violent action of the winds or waves. They do not embrace all losses happening on the seas. . . The rule has been laid down that a policy insuring against 'perils of the sea' covers only extraordinary risks." This same work clearly distinguishes the difference in meaning between the terms "perils of the sea" and "perils of navigation." 38 Corpus Juris, 1101, § 272. In the case of Reilly *v.* Home Ins. Co., 81 App. Div. 314 (81 N. Y. Supp. 59), it was held: "The burden of proof was upon the plaintiffs to show, by a fair preponderance of evidence, that the disaster arose from some of the perils insured against, and that it did not occur by reason of any inherent defects and other unseaworthiness as among the excepted risks. 2 Parsons on Marine Insurance, 518, says: "The insured must prove an extraordinary peril of the kind insured against, and a loss by that peril. It is a very frequent subject of inquiry whether the damage which is unquestionable as a fact was caused by a peril insured against or by some other cause. The burden of proof is of course on the insured, first to prove the damage, and then to show that it arose from such a peril." in Starbuck *v.* Phenix Ins. Co., 119 N. Y. App. Div. 139 (45 N. Y.

Supp. 995), it was said: "Without deeming it necessary to discuss all the different cases presented upon the former appeal and on this, we may adopt the view that 'damage done to a vessel by perils of the sea includes every specie of damage done to the vessel at sea by the violent and immediate action of the winds or waves, or both, as distinct from the ordinary wear and tear of the voyage, and as distinct from injuries suffered by the vessel in consequence of her not being seaworthy at the outset of her voyage, or afterwards, under circumstances in which the master was guilty of negligence in not making her seaworthy.'" In Allison *v.* Corn Exchange Ins. Co., 57 N. Y. 87, it was said: "In a marine policy against 'the perils of the sea' the underwriter assumes only extraordinary risks, and if a vessel goes down by the ordinary action of the wind and waves, the insurer is not responsible, for the vessel is assumed to have been seaworthy." In 1 Phillips on Insurance, § 1086, it is said: "Whatever risks are assumed by the underwriter, his liability is subject to two limitations; he is not liable for the consequences of the perils assumed except when they operate in an extraordinary degree, and he is liable only for damage and loss of an extraordinary kind." In Barnwell *v.* Church, 1 Caines (N. Y.), 217, 234 (2 Am. Dec. 180), it was said: "The insurer undertakes only to indemnify against the extraordinary and unforeseen perils of the sea, not against the ordinary perils to which every ship must be exposed in the usual course of the voyage."

Plaintiff in error relies upon the case of *Underwriters' Agency* v. *Sutherlin,* 55 *Ga.* 266. In that case it was held: "In a marine risk when navigation is partly by fresh water and partly by salt water and involves transshipment, proof of damage by water of any kind is, prima facie, proof of damage by the perils of *navigation* [italics ours], even if the wetting is caused by rains, and whether the rains fell on board, or on the usual transshipping wharf whilst the goods were upon the same in the ordinary course of transit." But it will be noted from a consideration of the terms of the policy there involved that quite a different question from that here involved was presented. In that case the perils undertaken were those of "navigation," and not "perils of the sea." The former term, as has been said, is much broader than the latter. Furthermore, the policy involved in that case covered injury from actual

contact with "water," and not actual contact of "sea water with the articles damaged, occasioned by sea perils," as in the instant case. See also Brazilian Export and Import Co. *v.* Firemans Fund Ins. Co., 106 Misc. Rep. (N. Y.) 139 (174 N. Y. Supp. 265). Thus, if it had been proved, as is only surmised, that the damage was in fact occasioned by contact with river water while the goods were in process of transshipment at an inland port, and even though it be conceded that the protection afforded by the contract against "perils of the sea" was not suspended while the goods were in an inland port, for the purpose of transshipment, it still would not follow that such damage had been shown to have been occasioned by what could be properly termed a "peril of the sea." Finally, even if it could be assumed that such an injury, when thus occasioned at such a port, could ordinarily be accounted to have been occasioned by a "peril of the sea," still, under the special and specific terms of the instant contract, the liability could not be extended to cover damage occasioned by contact with any water except sea water; and even though sea water, under the terms of the contract, be held to mean any water in which the vessel floated, there was no evidence whatever that the damage was caused by contact with such water.

*Judgment affirmed on the main bill of exceptions; cross-bill dismissed. Stephens and Bell, JJ., concur.*